*Exhibit "2"*

**DECLARATION OF DAVID W. QUINTO**

I, David W. Quinto, declare as follows:

1. I am one of the named defendants herein and I make this declaration of my personal and first-hand knowledge.  If called and sworn as a witness, I could and would testify competently hereto.

2. After graduating from Harvard Law School in 1982, I moved to Los Angeles, passed the bar exam, and was admitted to practice in California that year.  I have been an active member in good standing of the California Bar Association ever since with no record of discipline.  In 1983, I passed the bar exam in my home state of Arizona and have been a member of the Arizona Bar with no record of discipline ever since, although my membership has been inactive for much of that time.

3.  For 27 years I was principally responsible for the outside legal work of the Academy of Motion Picture Arts and Sciences and represented numerous well-known entities in copyright, trademark, and trade secret matters.  Beginning in 2003, I was the sole author of *Law of Internet Disputes*, three editions of which were published Aspen Law and Business.  I was subsequently recruited by Oxford University Press to write a legal practice guide addressing all aspects of U.S. trade secret protection and enforcement.  I was joined in that endeavor by a law school classmate, Stuart Singer.  The first three editions of our book, *Trade Secrets: Law and Practice*, were published by Oxford, which then sold the rights to the book to LexisNexis.  LexisNexis publishes new editions of our book annually.  I am currently working on the 2021

edition and have confirmed with LexisNexis that there will be a 2022 edition.

4. I have been a citizen of California continuously since 1982 and a resident of Los Angeles County for that period as well.  Since 1982, every car I have owned has been continuously registered in California, I have continuously had a California driver's license, I have always voted in California, every checking account I have had has been in California, and every residence I have leased or owned has been in California.

5. I have never had a Utah bank account of any kind, owned or leased any real property in Utah, registered a vehicle or voted in Utah, had a Utah telephone number, or owned, rented, or possessed office space in Utah. Before VidAngel was formed, I had camped in Utah as a child, visited Salt Lake City once for business sometime before 2010, and had gone skiing there four or five times.  I last visited Utah in early November 2018, when I was required to testify in a Utah Bankruptcy Court proceeding.

6. In January 1986, Phyllis Kupferstein and I were two of the four lawyers who founded a firm then known as Quinn & Emanuel, LLP and known today as Quinn Emanuel Urquhart & Sullivan, LLP.  Together with John B. Quinn and Eric J. Emanuel, we established Quinn & Emanuel on the 10th floor of the abandoned Tokai Bank Building in downtown Los Angeles.

7. In March 2014, at Ms. Kupferstein's persuasion, I left Quinn Emanuel, which was by then a multi-national litigation behemoth, to return to small firm practice, joining her in founding our own firm.  That firm, Kupferstein Manuel & Quinto, LLP ("KMQ"), had just two members— Ms. Kupferstein and me—and was the predecessor firm to the defendant

Kupferstein Manuel, LLP ("KM") firm.  The KMQ firm had no client in Utah apart from the Chapter 11 debtor herein.

8. While I was in practice with KMQ in September 2014, I received a telephone call from Neal Harmon, the CEO of real-party-in-interest VidAngel, Inc.  After confirming that I was free of conflicts, Mr. Harmon asked whether I would be willing to prepare an opinion letter to be shared with Apple as required to gain its consent to allow a VidAngel app on its platform.  If approved, the app would allow consumers with Apple devices to watch "filtered" motion pictures.  By "filtering," Mr. Harmon explained that he meant muting words or skipping scenes or images at a consumer's direction as the movie was being watched.  I replied that I could do so, but only after we had entered into a written retainer agreement, which I then prepared and sent to him by e-mail.  The retainer letter (a true and correct copy of which is attached as Exhibit A) provided on page 7 that any disputes arising out of the services I provided under KMQ's auspices would  be resolved by a confidential binding arbitration in Los Angeles under California law.

9. I thereafter provided oral advice to Mr. Harmon concerning copyright law, authored an opinion letter (a true and correct copy of which is attached as Exhibit B) that VidAngel had requested for the limited purpose of persuading Apple to approve its app, and drafted a single letter sent to major motion picture studios and television networks to put them on notice of VidAngel's service and technology.  A true and correct copy of that letter is attached as Exhibit C.

10. In August 2015, I resigned from my membership in KMQ to join Davis Wright Tremaine, LLP ("DWT") in its Los Angeles office, believing that its national presence would provide a better platform for my practice.

Because DWT had a business conflict, I was required to terminate my representation of VidAngel at the end of August.

11. Mr. Harmon then told me that he was sure Disney would sue VidAngel for filtering its content and said that he wanted to have litigation counsel lined up and ready to go when that happened.  He asked for my opinion concerning various intellectual property litigation firms he identified to me before retaining Baker Marquart, LLP in Los Angeles to be ready to defend VidAngel at a moment's notice and, in the interim, to address questions concerning copyright law raised by VidAngel's board members and potential investors. I did not charge for those services

12. Disney, joined by Fox and Warner Bros., filed suit against VidAngel in Los Angeles, California on June 9, 2016 (the "Disney Litigation").

13. Mr. Harmon then called me repeatedly seeking to find any way that would permit me to participate in defending VidAngel in the Disney Litigation.

14. We ultimately agreed that I would resign from DWT to become VidAngel's general counsel.  We also agreed that I would be literally "in house" in that I would work from home, would not seek admission to the Utah bar, and would limit my legal services to participating in the Disney litigation, preparing contracts, and advising VidAngel as to federal law. While I was employed by it, VidAngel paid my salary by direct deposit into my City National Bank account in Los Angeles.  During my employment, I never had a bank account in Utah, never had a Utah telephone number, never had a physical residence in Utah, and never had an office at VidAngel or elsewhere in Utah.

15. I worked for VidAngel from California from August 1, 2016, until my employment was terminated by VidAngel's Chapter 11 trustee on November 11, 2019. I did so pursuant to an Offer of Employment sent to me by Mr. Harmon on July 21, 2016, a true and correct copy of which is attached as Exhibit D. While I was employed by VidAngel, I estimate that I visited Utah three or four times a year beginning in July 2016 (when I visited VidAngel while considering whether to accept its offer of employment) and very early November 2018 (when I testified in a Utah Bankruptcy Court proceeding). I have not returned to Utah since then.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of May 2020 at Los Angeles, California.

David W. Quinto

# *Exhibit "A"*

**KUPFERSTEIN MANUEL & QUINTO LLP**
11845 W. OLYMPIC BOULEVARD
SUITE 1000
LOS ANGELES, CA 90064

TELEPHONE: (424) 248-6650
FACSIMILE: (424) 248-6652

September 26, 2014

**STRICTLY CONFIDENTIAL – ATTORNEY-CLIENT**

**PRIVILEGED MATERIAL**

*Via Electronic Mail*

Neal Harmon, CEO
VidAngel, Inc.
251 N. University Avenue
Provo, UT 84601
nealsharmon@gmail.com

RE: Opinion Letter

Dear Mr. Harmon:

We are pleased to confirm that VidAngel, Inc. ("VidAngel") has engaged Kupferstein Manuel & Quinto LLP ("KMQ") as counsel to provide advice regarding copyright matters. Specifically, we are to work with Joseph M. Shapiro to prepare an opinion letter to be directed to you. We understand that the letter will be shared with Apple for the purpose of persuading Apple to allow VidAngel to create an iPhone app. The letter will analyze selected legal issues that could arise under the copyright laws if VidAngel proceeds with its plan to allow subscribers to make backup copies of DVDs on their iPhones and other devices, and share those backup copies with other users of VidAngel's network (the "Engagement"). You have instructed us that the opinion letter should not be comprehensive but should address only questions or concerns that Apple might raise. For now, our work is limited to preparing the opinion letter described above. The purpose of this letter is to confirm the terms and conditions upon which KMQ will provide legal services to VidAngel in connection with the Engagement. We believe that a mutual understanding of these terms and conditions at the outset is fundamental to establishing a good working relationship. In this engagement letter, we sometimes refer to VidAngel as "you" or "your" and to KMQ as "we," "our" or "us."

**Client**

Our engagement is on behalf of VidAngel only. In representing VidAngel, we will not be representing any officer, director, employee, owner, founder, member, shareholder or partner of, or any other person affiliated with, VidAngel, or any subsidiary, parent or other affiliate of VidAngel. If any of these persons or entities think that they may require counsel, we would be happy to discuss with them whether we might be able to represent them as well, but any such representation would need to be covered by a separate engagement letter, and would depend on a review by us and disclosure to all concerned of the conflicts of interest that would arise in connection with any such concurrent representation, and on appropriate consents being obtained from VidAngel and from those seeking such additional representation.

**Scope of Engagement**

Scanned by CamScanner

Neal Harmon, CEO
Re: Legal Representation of VidAngel, Inc.
September 26, 2014
Page 2

You have engaged KMQ to represent you in connection with the Engagement. KMQ's services will be limited to the representation of VidAngel in the Engagement. Our services will not extend to other business, personal or legal affairs of VidAngel, or to any other aspect of VidAngel's activities. This Engagement is not intended to encompass any matter in which the professional services of KMQ will be involved in entering an appearance in any litigation or before any tribunal, and any such matter shall be the subject of an additional separate and specific engagement letter. KMQ's receipt or use of confidential or other information from VidAngel or others in the course of this representation does not mean that KMQ will render any other advice or services either to VidAngel or any other person or entity. Similarly, VidAngel will not look to or rely upon KMQ for any investment, accounting, financial or other non-legal advice, including without limitation any advice regarding the character or credit of any person with whom VidAngel might be dealing.

**Insurance Coverage and Claims**

VidAngel understands and agrees that KMQ is not being engaged to advise regarding the existence of any insurance coverage in connection with the circumstances of the Engagement or to advise or assist in the formulation or submission of any insurance claim in connection with the Engagement.

**Responsible Persons – Communications Between KMQ and VidAngel**

We will keep VidAngel regularly and currently informed of the status of the Engagement and will consult with you whenever appropriate. Within KMQ, I will be primarily responsible for the Engagement. My office telephone number and e-mail address are (424) 248-6654 and dq@kmqlitigation.com. In the event that you need to reach me and I am unavailable, please leave a voicemail message for me. It is my policy that all calls will be returned promptly and, in any event, no later than within one business day of receipt of the call; if you have not received a return call within that time, please call again. Also, should you have an urgent need to reach me, my mobile telephone number is (213) 604-1777. In the event of an emergency, please call my assistant, Leila A. Ferguson, at (424) 248-6650; she will endeavor to reach me as soon as practicable thereafter.

We anticipate that other attorneys may be working with me on the Engagement, but we may change the staffing as the need arises. I will of course seek to staff this Engagement in a manner that I think will be the most effective and efficient. I will be happy to discuss with you any staffing issues or concerns you may have at any time.

**Protection of Client Confidences – High Tech Communication Devices**

We are always mindful of our central obligation to preserve the precious trust our clients repose in us-- their secrets and confidences. We take this duty very seriously and, except to the extent permitted by the applicable rules of professional conduct, we will not disclose any confidential information of yours to any other client or person. Similarly, we cannot disclose to you the confidences of any other client, even when such information relates to matters that might affect you.

To meet our obligation to preserve your confidences, it is important that we agree from the outset what kinds of communications technology we will employ in the course of this Engagement. Unless you specifically

Neal Harmon, CEO
Re: Legal Representation of VidAngel, Inc.
September 26, 2014
Page 3

direct us to the contrary, for purposes of this Engagement, we agree that it is appropriate for us to use fax machines and e mail in the course of the Engagement without any encryption or other special protections. Please notify me if you have any other requests or requirements in connection with the methods of telecommunication relating to the Engagement.

## VidAngel's Designee to Receive Communications

We understand that Neal Harmon ("Mr. Harmon") is the person primarily responsible for managing the Engagement within VidAngel and that he is authorized to direct our activities and deal with us on any issues relating to the Engagement, including billing. Unless otherwise directed by VidAngel, we shall fulfill our obligation to VidAngel to keep VidAngel informed as to the progress of the Engagement by communicating with Mr. Harmon and by keeping Mr. Harmon so informed, and it shall be the obligation of Mr. Harmon to communicate with all others within VidAngel regarding the progress of the Engagement.

## Responsibilities of Client

To represent you effectively, it is important that you provide us with complete and accurate information regarding the subject matter of the Engagement, and that you keep us informed on a timely basis of all relevant developments. In addition, it is important that VidAngel and its officers and employees provide us with timely assistance and cooperation in connection with the Engagement.

Recent changes in the Federal Rules of Civil Procedure, Federal Rules of Evidence, and case law addressing electronic discovery have profoundly altered the obligations of the parties involved in litigation and their counsel. An understanding of these changes, which relate to the duties of preservation and discovery of electronically stored information ("ESI"), is an essential prerequisite to the development of a successful litigation strategy for every client. Because the duty to preserve potentially relevant information is triggered when litigation is reasonably anticipated or commenced, and because the failure to comply with these rules can have dire consequences (including sanctions ranging from monetary penalties, to entry of a default against you/your action being dismissed), we have prepared a written guideline explaining in detail these rules, their operation, and the consequences of failing to adhere to them.

## No Guarantee of Result

In providing legal advice to you, I or others at KMQ may from time to time express opinions or beliefs regarding the likely effectiveness of various courses of action or about results that may be anticipated. You understand that any such statements are opinions and beliefs only and are not promises or guaranties. We cannot and do not guarantee any particular course or outcome of the Engagement.

## Billing

Our fees are based on the amount of time we spend on this Engagement. Each KMQ attorney, legal assistant and other timekeeper assigned to this Engagement will have an hourly billing rate. My ordinary billing rate is $600 per hour. Scott Commerson's ordinary billing rate is $500 per hour. Other lawyers may perform tasks on this Engagement of rates ranging from $350 to $600 per hour. We have agreed to discount the fees of all professionals by 10% in recognition of VidAngel's status as a start-up business. If one of our professionals

Neal Harmon, CEO
Re: Legal Representation of VidAngel, Inc.
September 26, 2014
Page 4

performs multiple tasks for VidAngel during the course of a day, our statement will describe those tasks in a continuous narrative form accompanied by a single time entry for all tasks, a practice known as "block billing." You agree that we may block bill.

We will submit bills on a monthly basis using Serengeti for e-billing or, if you prefer, by electronic mail. All bills shall be paid within ten days of receipt by VidAngel. The obligation to pay our bills is solely yours and is not contingent upon any judgment or settlement; any right you may have for reimbursement, indemnification, insurance or the like; or your receipt of any other form of payment you may expect to receive from some other party. If VidAngel has any question regarding, or wish to challenge, any bill, VidAngel shall notify us promptly of any such question or challenge, and shall in any event pay any portion of such bill that is not subject to question or challenge.

**Estimates**

VidAngel understands that it is impossible to determine in advance the amount of fees and costs needed to complete any given matter. During the course of our Engagement, we will provide VidAngel with estimates of costs and fees or projected budgets for our work going forward. In all instances when we provide such projections, they should be viewed as guidance only. The fees and costs which VidAngel will be liable for will be based on our time charges as set forth in this agreement, and not on any such projections.

**Ancillary Costs**

We will charge separately for certain ancillary services we provide, such as facsimile charges, secretarial and paralegal overtime and word processing. We pass along out-of-pocket costs and charges that we incur on our clients' behalf. These typically include messenger charges, deposition videography and transcript charges and administrative charges. Other charges are based on market, not cost, including document reproduction ($0.24/page), black and white scanning ($0.24/page), black and white blowbacks ($0.24), OCR ($0.03/page), key term data filtering ($200/GB), Clearwell data search and culling ($375/GB), Digital Reef search and culling ($175-$225/GB), EDD ($525-$850/GB), image endorsement ($0.02/page), media creation and duplication ($15-$400), document coding ($0.28-$1.50/document), hosting ($25/GB) and litigation support consulting at hourly rates of $150 to $365 per hour depending on the work performed. Additionally, we charge for travel costs, meal charges and parking charges (when we are working exclusively on your matter), filing fees, telephone toll charges, fees for experts and other consultants retained on VidAngel 's behalf, and similar charges. These charges will be at cost.

In some cases, particularly if the amount is large, we may forward an invoice from an outside vendor or service directly to VidAngel for payment, which will also be due and payable upon receipt. Failure to pay such invoice upon request will be grounds for us to withdraw from our representation.

**Retainer**

Our retainer fee is $20,000, but we will expend time in providing our services only as specifically agreed between us. That sum will be used to pay our fees, costs and other expenses incurred on VidAngel's behalf. If the retainer balance is exceeded or drawn down to pay our monthly statements, our fees should be

Scanned by CamScanner

Neal Harmon, CEO
Re: Legal Representation of VidAngel, Inc.
September 26, 2014
Page 5

paid and the retainer replenished to its full amount within ten days of your receipt of our statement, so that full retainer balance is always maintained.

If the pace of work increases or for any other reason the retainer is not sufficient to cover our outstanding unpaid fees, disbursements and other charges during the course of the month, VidAngel will pay us an additional retainer.

All retainer funds that VidAngel deposits with us as an advance against our fees and charges will be deposited and maintained in the firm client trust account. Upon delivery of bills in accordance with the terms of this Engagement Letter, the retainer funds held up to the amount of such bills will be treated as property of KMQ and may be withdrawn from our client trust account. Any balance of the retainer then remaining will be credited toward the amount of our final bill on completion of our representation, and if the amount of the retainer exceeds the total charge for our final bill, we will refund any excess to VidAngel.

Please let us know promptly if you have any questions or concerns regarding the services provided by anyone at KMQ or regarding any billing statement so that we can act appropriately.

**Termination**

Above all, our relationship with you must be based on trust, confidence and clear understanding. If you have any questions at any time about this letter or the work that the firm, or any attorney, is performing, please call me to discuss it. You may terminate this representation at any time, with or without cause. Subject to the application of the applicable rules of professional responsibility, we also reserve the right to withdraw if, among other things, you fail to make timely payment of any invoice, you fail to cooperate or follow KMQ's advice on a material matter, or any fact or circumstance arises that, in KMQ's view, renders our continuing representation unlawful or unethical. In the event of termination by either of us, fees and costs for work performed prior to termination will still be payable to the extent permitted by law.

**Date of Commencement and Termination of the Engagement**

The effective date of our agreement to provide services is the date on which we first performed services. The date at the beginning of this letter is for reference only. If this letter is not signed and returned with the retainer for any reason, VidAngel will be obligated to pay us the reasonable value of any services we have performed as well as the costs we have incurred on VidAngel's behalf.

KMQ's representation of VidAngel will be considered terminated at the earlier of (i) VidAngel's termination of the representation, (ii) KMQ's withdrawal from the representation, or (iii) the completion of KMQ's substantive work which, in the absence of a letter notifying you of the completion of the Engagement, shall be presumed to occur six months after the rendition of the final bill.

**File Retention and Disposition**

After the Engagement has concluded, and subject to payment of all outstanding fees and disbursements, you may request the return of files pertaining to the Engagement. VidAngel's files will be released only following delivery to KMQ of a signed release letter containing appropriate directions and acknowledgment of

Neal Harmon, CEO
Re: Legal Representation of VidAngel, Inc.
September 26, 2014
Page 6

the obligation to pay outstanding fees. KMQ may charge you for the reasonable costs of retrieval, assembly, copying and transfer of all files or materials in any format. It is our practice to retain the permanent records of the matter, in accordance with our records retention policy, for a period of not less than 7 years after the Engagement has ended. If you do not request the files in writing before the end of our retention period, upon the expiration of that period we will have no further obligation to retain the files and may, at our discretion, destroy the files without further notice to you.

**Other Litigation or Proceedings**

If, as a result of this Engagement, and even if the Engagement has ended, we are required to produce documents or appear as witnesses in any governmental or regulatory examination, audit, investigation or other proceeding or any litigation, arbitration, mediation or dispute involving VidAngel or related persons or entities, VidAngel shall be responsible for the costs and expenses we reasonably incur (including professional and staff time at our then-standard hourly rates). Similarly, if we are sued or subjected to legal or administrative proceedings as a result of our representation of VidAngel in this matter, VidAngel agrees to indemnify us for any attorney's fees and expenses (including our own professional and staff time at our then-standard hourly rates) we incur as a result. This paragraph is not intended to apply to any claim brought by or on behalf of VidAngel alleging wrongdoing by KMQ.

**Arbitration**

Although we think it is unlikely, it is possible that a dispute may arise between us regarding some aspect of the Engagement and our representation of you. If the dispute cannot be resolved amicably through informal discussions, we believe that most, if not all, disputes can be resolved more expeditiously and with less expense by binding arbitration than in court. This provision will explain under what circumstances such disputes shall be subject to binding arbitration.

**CALIFORNIA AGREEMENT TO ARBITRATE:**

(a)     Any dispute between KMQ and VidAngel as to attorneys' fees and/or costs in connection with the Engagement shall be resolved as follows:

1.     If any such fee and/or cost dispute arises, KMQ shall provide VidAngel with written notice of VidAngel's right to arbitrate under the California State Bar Act (Bus. & Prof. Code § 6200, et seq.). Those procedures permit a trial after arbitration, unless the parties agree in writing, after the dispute has arisen, to be bound by the arbitration award.

2.     If VidAngel exercises its rights under the California State Bar Act, VidAngel and KMQ may thereafter agree that the arbitration will be binding.

3.     If VidAngel exercises its rights under the California State Bar Act, and VidAngel and KMQ do not agree that the arbitration is binding, then VidAngel and KMQ agree that the dispute will be subject to mandatory arbitration as described in ¶ (b) below.

Neal Harmon, CEO
Re: Legal Representation of VidAngel, Inc.
September 26, 2014
Page 7

4.    If, after receiving notice of its right to arbitrate, VidAngel does not exercise its rights under the California State Bar Act by filing a request for fee arbitration within 30 days, VidAngel and KMQ agree that the dispute will be subject to mandatory arbitration as described in ¶ (b) below.

Any other dispute arising under the Engagement or in connection with the provision of legal services by KMQ including, without limitation, any claim for breach of contract, professional negligence or breach of a fiduciary duty, shall be resolved by confidential, binding arbitration as described in ¶ (b) below.

By initialing below and signing this Engagement Letter, VidAngel and KMQ confirm that they have read and understand these paragraphs concerning arbitration and voluntarily agree to binding arbitration. In doing so, VidAngel and KMQ voluntarily give up important constitutional rights to trial by judge or jury, as well as rights to appeal; depending on the rules of the arbitration program, both also may be giving up their rights to discovery. If VidAngel later refuses to submit to arbitration after agreeing to do so, VidAngel may be ordered to arbitrate pursuant to the provisions of California law. VidAngel is advised that it has the right to have an independent lawyer of VidAngel's choice review these arbitration provisions, and this entire agreement, prior to initialing this provision or signing this Engagement Letter.

Neal Harmon

David W. Quinto

(b)    ARBITRATION PROCEDURES:

In the event of any dispute that is subject to arbitration pursuant to ¶ (a) above, the initiating party will provide a written demand for arbitration to the other party setting forth the basis of the initiating party's claim and the dollar amount of damages sought.

The parties further agree that, if arbitration is necessary, each arbitration will:

1.    Be heard and determined by a panel of three arbitrators (all of whom will be retired state or federal judges with at least five years judicial experience), with one selected by each party to the arbitration, and the third selected by the first two from the panel of arbitrators of JAMS (or its successor), which JAMS arbitrator will not be the mediator who handled the mediation referred to above;

2.    Take place in the city in the United States where the KMQ attorneys who spent the most time on the Engagement are located (the "applicable city");

3.    Be conducted in accordance with JAMS Streamlined Arbitration Rules and Procedures (or any successor rules and procedures), in effect at the time the initiating party delivers to the other party the demand for arbitration required hereunder;

4.    Apply the laws of the jurisdiction in the United States where the applicable city is located. The arbitration proceedings and the decision of the arbitrator will be confidential.

Neal Harmon, CEO
Re:  Legal Representation of VidAngel, Inc.
September 26, 2014
Page 8

Notwithstanding anything to the contrary contained in this agreement, the prevailing party in any arbitration, action or proceeding to enforce any provision of this agreement will be awarded attorneys' fees and costs incurred in that arbitration, action or proceeding even if the law provides otherwise, including, without limitation, the value of the time spent by KMQ attorneys to prosecute or defend such arbitration, action or proceeding (calculated at the hourly rate(s) then normally charged by KMQ to clients which it represents on an hourly basis), except that the foregoing shall not apply to any mediation, as described above, and the parties will split the fees of the arbitrator; and

5.    Be final and binding on both parties, will not be subject to de novo review, and that no appeal may be taken.  The ruling of the arbitrator(s) may be entered and enforced as a judgment by a court of competent jurisdiction.  The arbitration provisions of this Agreement may be enforced by any court of competent jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses.

By signing below, VidAngel agrees that VidAngel has had enough time to review this letter, that we have advised you that VidAngel has the right to consult another, independent lawyer about the provisions relating to the waiver of conflicts of interest and any other aspect of this letter as to which VidAngel may wish to avail itself of such advice, and that VidAngel is satisfied that it understands this letter.  VidAngel also agrees that VidAngel has the freedom to select and engage the counsel of its own choice and accordingly that this is an arm's length agreement between parties of equal bargaining strength and that VidAngel has freely determined, without any duress, to sign and agree to these terms.

**Severability**

Should any part of this Agreement, or language within any provision of this Agreement, be rendered or declared invalid by a court of competent jurisdiction of the State of California, such invalidation of such part or portion of this Agreement, or any language within a provision of this Agreement, should not invalidate the remaining portions thereof, and they shall remain in full force and effect.

**Amendments and Additional Engagements**

The provisions of this letter may only be amended in writing, signed by both parties.

If VidAngel later asks us to take on additional assignments, we will send you a supplementary engagement letter reflecting each additional assignment.

I am enclosing two executed copies of this letter.  If the foregoing accurately reflects our agreement, please confirm that by signing and returning one of the enclosed copies to me.  Please do not hesitate to call me to discuss any questions you may have regarding this agreement.  In conformance with KMQ's policies, we cannot commence work on this Engagement until we have received a copy of this letter countersigned by you and your payment of the initial retainer.

Scanned by CamScanner

Neal Harmon, CEO
Re: Legal Representation of VidAngel, Inc.
September 26, 2014
Page 9

Thank you again for this opportunity to be of service.  We look forward to working with you on this Engagement.

Very truly yours,

David W. Quinto

STATEMENT TO BE SIGNED BY CLIENT:

I have read the above Engagement Letter and understand and agree to its contents.

VidAngel

Date:   9/26/2014

Neal Harmon, CEO.

Neal Harmon, CEO
Re: Legal Representation of VidAngel, Inc.
September 26, 2014
Page 7

4.      If, after receiving notice of its right to arbitrate, VidAngel does not exercise its rights under the California State Bar Act by filing a request for fee arbitration within 30 days, VidAngel and KMQ agree that the dispute will be subject to mandatory arbitration as described in ¶ (b) below.

Any other dispute arising under the Engagement or in connection with the provision of legal services by KMQ including, without limitation, any claim for breach of contract, professional negligence or breach of a fiduciary duty, shall be resolved by confidential, binding arbitration as described in ¶ (b) below.

By initialing below and signing this Engagement Letter, VidAngel and KMQ confirm that they have read and understand these paragraphs concerning arbitration and voluntarily agree to binding arbitration. In doing so, VidAngel and KMQ voluntarily give up important constitutional rights to trial by judge or jury, as well as rights to appeal; depending on the rules of the arbitration program, both also may be giving up their rights to discovery. If VidAngel later refuses to submit to arbitration after agreeing to do so, VidAngel may be ordered to arbitrate pursuant to the provisions of California law. VidAngel is advised that it has the right to have an independent lawyer of VidAngel's choice review these arbitration provisions, and this entire agreement, prior to initialing this provision or signing this Engagement Letter.

Neal Harmon                                                David W. Quinto

(b)     ARBITRATION PROCEDURES:

In the event of any dispute that is subject to arbitration pursuant to ¶ (a) above, the initiating party will provide a written demand for arbitration to the other party setting forth the basis of the initiating party's claim and the dollar amount of damages sought.

The parties further agree that, if arbitration is necessary, each arbitration will:

1.      Be heard and determined by a panel of three arbitrators (all of whom will be retired state or federal judges with at least five years judicial experience), with one selected by each party to the arbitration, and the third selected by the first two from the panel of arbitrators of JAMS (or its successor), which JAMS arbitrator will not be the mediator who handled the mediation referred to above;

2.      Take place in the city in the United States where the KMQ attorneys who spent the most time on the Engagement are located (the "applicable city");

3.      Be conducted in accordance with JAMS Streamlined Arbitration Rules and Procedures (or any successor rules and procedures), in effect at the time the initiating party delivers to the other party the demand for arbitration required hereunder;

4.      Apply the laws of the jurisdiction in the United States where the applicable city is located. The arbitration proceedings and the decision of the arbitrator will be confidential.

*Exhibit "B"*

## Kupferstein Manuel & Quinto LLP
11845 W. Olympic Boulevard
Suite 1000
Los Angeles, CA  90064

Telephone:  (424) 248-6650
Facsimile:  (424) 248-6652

### PRIVILEGED AND CONFIDENTIAL

### MEMORANDUM

**To:**  VidAngel

**From:**  David Quinto

**Date:**  February 25, 2015

**RE:**  Analysis of Copyright Issues Potentially Implicated by VidAngel's Current Proposed Technology

=============================================================================

## I.  INTRODUCTION

This Opinion addresses copyright issues that potentially could affect VidAngel's technology, currently under development, as you have described it to us. When fully developed, the technology will allow owners of digital video discs, typically referred to simply as "DVDs," to filter objectionable content, as authorized by statute. VidAngel has told us that content will be streamed to VidAngel customers. However, each user will first be required to purchase a physical DVD containing that content, which DVD will be stored by VidAngel in a vault. All content streamed by VidAngel to a purchaser will be screened to silence or remove content that the viewer has chosen not to hear or see. Although the underlying work will be re-formatted to permit streaming, no fixed copy beyond that which is stored in temporary memory or Amazon's Cloud computing system by FFmpeg will be made, nor will any alteration to the underlying work be made, either by VidAngel or by its subscribers. As VidAngel's proposed technology has been described to us, we believe that VidAngel's current service is lawful.

### A.  VidAngel's Proposed Technology

VidAngel has advised us that its service relies on HTTP Live Streaming (HLS) encryption to let customers enjoy video over HTTP for playback on devices running iOS, including the iPhone, iPad, and iPod Touch, Roku, Chromecast, and desktop and laptop computers. VidAngel's service utilizes the Advanced Encryption Standard (AES), as well as other technologies, to seamlessly protect content from non-authorized streaming, piracy, and redistribution by others, with no detectable difference to video playback. VidAngel has additionally advised us that it employs a one-screen policy for playback based on the user's account, IP address and other information.

VidAngel has further advised us that, as envisioned, its service will remove technological obstacles that currently prevent or dissuade many consumers from enjoying the benefits conferred on them by the Family Home Movie Act of 2005 (the "Family Movie Act"), 17 U.S.C. § 110(11). Specifically, VidAngel will itself lawfully purchase and own a physical copy of every work and will make its own re-formatted

PRIVILEGED AND CONFIDENTIAL

copy of each as allowed by the Copyright Act. *See RealNetworks, Inc. v. DVD Copy Control Ass'n,* 641 F. Supp. 2d 913, 942-43 (N.D. Cal. 2009)(construing 17 U.S.C. § 1201(b) as permitting DVD owners to make re-formatted back-up copies); and *United States Copyright Office Summary (Dec. 1998)* at 4 (characterizing the creation of re-formatted back-up copies as enabling a "fair use"). The works will then be coded or "tagged" to identify at least 20 types of content a viewer might prefer not to hear of see. Examples of such content types are blasphemous words, other swear words, graphic violence, and non-graphic violence.

After a work has been coded, physical copies of the work will be offered for sale to VidAngel's users. Those copies will already have been purchased lawfully by VidAngel. VidAngel's users will pay a substantial purchase price for the works, such as $20 for an ordinary DVD and $25 for a Blu-Ray DVD. (Because there is no legal distinction between an ordinary DVD and a Blu-Ray DVD, they are collectively referred to herein simply as "DVDs".) The users will then be shown a listing of the various types of potentially objectionable content identified in that work, as well as the number of occurrences of each such type of content within the work. The user will then select the types of content he or she wishes to have silenced or deleted.

After making that selection, a VidAngel user will be permitted to have the work streamed to him or her on one device screen at a time. VidAngel will filter the specific content identified by its customer to be screened as the content is streamed to the customer but will make no permanent copy of the work as streamed. The devices a subscriber may use can include desktop, laptop, or tablet computers, cellular telephones, televisions, and other devices on which motion pictures or television programs can be viewed.

Although someone who buys a DVD from a store may lawfully lend that DVD to others, VidAngel seeks to prevent its users from engaging in file-sharing activities. As a further protection against file-sharing and to impose the same limitation on use that most DVD purchasers face, VidAngel will stream a work to just one of a user's registered devices at a time. Thus, a VidAngel user will not be able to have a work streamed simultaneously to a television set and a computer device. Although an ordinary consumer who purchases a DVD may lawfully "rip it" to create a back-up copy and may therefore lawfully create a lawful means to permit a given work to be viewed on two devices simultaneously, VidAngel is implementing this restriction to reflect that its users are unlikely to make back-up copies for themselves.

A VidAngel customer will be permitted to sell a disk back to VidAngel at any time, with the re-purchase price declining $2.00 per day. In this manner, if a customer purchases a DVD of a movie, watches the movie that night, and sells it back to VidAngel immediately after watching it, he or she will have a credit of $18.00 to apply to the purchase of another work. If the customer watches the first part of a movie one night, finishes watching it the next night, and then sells it back immediately, the viewer will have a credit of $16.00 to apply to the purchase of another work.

As contemplated by VidAngel, its system will not result in making a re-formatted copy of the vast majority of the DVDs it purchases. Instead, VidAngel might, for example purchase a single copy of *Lone Survivor* or *12 Years a Slave,* make a single re-formatted copy of each, and then sell 10,000 copies of *Lone Survivor* or *12 Years a Slave* without making 10,000 more re-formatted copies of each. However,

PRIVILEGED AND CONFIDENTIAL

as explained more fully below, the Family Movie Act permits the use of *any* authorized copy for that purpose and does not require that each copy be re-formatted.

**B.     VidAngel's Intent in Developing Its Technology**

Judicial decisions applying copyright law to new technologies have frequently turned on two, usually related, questions: "Does the new technology injure copyright owners economically?," and "Is the technology owner's intent to circumvent the protections afforded to copyright owners by the Copyright Act?" For example, in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984), the Supreme Court held that the Betamax could lawfully be sold--even though it could be used to infringe--because it had substantial non-infringing uses. It enabled television viewers to exercise a legal right—recording television programs for later viewing—that until its advent had been technologically inaccessible to the average homeowner. In so holding, the Supreme Court ignored that when viewers watched programming later, they could fast forward through commercials. The opinion therefore contemplated that there would be no economic harm to the networks arising from the intended use of the technology. In contrast, in *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001), the Ninth Circuit held that Napster was both contributorily and vicariously liable under the Copyright Act for providing its services notwithstanding that Napster's technology had substantial non-infringing uses. That result turned on the finding that Napster's founders were aware that their technology could and would be used to facilitate infringement and that they knew that their profits would increase as infringements increased.

VidAngel has advised us that its intent is to develop software and related technology to enable consumers to engage lawfully in personal movie filtering as contemplated and expressly authorized by the Family Movie Act. VidAngel has reported to us that a survey it conducted of 900 people reflected that 47 percent of parents were either likely or very likely to use parental-control software to filter instances of swearing and other content they view as inappropriate from movies being streamed to their homes. VidAngel has also advised us that there is a significant demand, even among college-aged and under-30 consumers, to enjoy content lawfully while allowing the copyright owners to be compensated fairly. VidAngel has further advised us that consumers now own various devices and have various means that potentially allow them to watch content they already own, but those devices and means do not permit the use of DVDs. For example, it is possible to watch content on a cellular telephone but it is not possible to insert a DVD into a cellular telephone to provide it with that content.

VidAngel has also advised us that the current legal and technological landscape has made it relatively easy to acquire, view, and share content unlawfully, and that the persons who engage in such unlawful activities tend to be very computer- and Internet-savvy. On the other hand, the very substantial percentage of consumers who do not want to steal or deny copyright owners payment for their work tend to be much less computer- and Internet-savvy and thus find it difficult to conveniently and *lawfully* reformat the content of DVDs they own so that it may be filtered for objectionable content before they play those DVDs. VidAngel therefore anticipates that copyright infringers will not gravitate to its

PRIVILEGED AND CONFIDENTIAL

technology because there already are, and will always be, easier ways to steal, view, and sell copyrighted content unlawfully.

VidAngel's observation finds support in professional literature. One recent study that we examined demonstrated that persons who do not now infringe, as well as a substantial cohort of persons who *do* infringe, would like to have an easy-to-use means to filter the content of their DVDs lawfully.[1] The study authors reported that many consumers who engage in such activities unlawfully, thereby denying the copyright owners just compensation, do so only because they find current technologies for filtering content lawfully are unwieldy.[2] Further, copyright holders may receive practical benefits when consumers are enabled to view content other than by using a DVD player, and to view content without fear that they would be exposed to content they would find objectionable.

In addition to providing a "bleep or delete" function that users will control, VidAngel has told us that it wanted to enable DVD owners who are not technologically savvy to benefit from recent advances in technology to view and sell the content of their DVDs easily, and in ways that VidAngel hopes will comport in all respects with the copyright laws. VidAngel has told us that its technology is more cumbersome to use and far more restrictive than available options for stealing copyrighted content.

Additionally, VidAngel had advised us that it is now seeking feedback from a major content distributor and will seek feedback from the major motion picture studios concurrently with the beta testing. In doing so, VidAngel will request their feedback concerning whether they believe the implementation of the technology will violate their legal rights in any respect and, if so, what modifications could be made to alleviate the stakeholders' concerns.

## II     LEGAL ANALYSIS

### A.     Overview

We have preliminarily analyzed VidAngel's technology in light of governing copyright principles, statutes, and case law. Based on our understanding of the proposed technology, we preliminarily conclude that VidAngel's technology is being developed and will be implemented to respect the rights of copyright holders and that a court could well conclude that VidAngel's introduction and use of its proposed technology will not directly, contributorily, or vicariously violate the Copyright Act.

To some extent, the enactment of new copyright statutes and developments in the case law have attempted to enable consumers to exercise old rights using new technologies. For example, the Digital Millennium Copyright Act ("DMCA") provides that consumers engage in a fair use by reformatting the

---

[1] Digital Media Unmonetized Demand and Peer-to-Peer File Sharing Report, First and Second Quarter 2014.

[2] Digital Media Unmonetized Demand and Peer-to-Peer File Sharing Report, First and Second Quarter 2014, at 6.

PRIVILEGED AND CONFIDENTIAL

contents of DVDs for personal use.[3]  (As a practical matter, though, that right is effectively denied to ordinary consumers, who lack an easy-to-use means to generate reformatted copies.  Only the most technology savvy DVD owners can utilize current viewing and sharing technologies.)

To a further extent, the enactment of new copyright laws has given consumers new rights.  For example, The Family Movie Act, 17 U.S.C. § 110(11), permits "making imperceptible, by or at the direction of a member of a private household, of limited portions of audio and video content of a motion picture, during a performance in or transmitted to that household for private viewing at the direction of a member of a private household."  The term "motion picture" is defined in § 101 as "audio visual works consisting of a series of related images which when shown in succession, impart an impression of motion, together with accompanying sounds, if any."  Thus, the motion picture filtering right includes the right to filter television programs as well as motion pictures.  The Family Movie Act expressly authorizes individuals or others acting at their direction to silence or skip (sometimes referred to as "bleep or delete") portions of such content when it contains language or depicts acts of violence or physical intimacy that the individual considers offensive.

Notwithstanding that there is a right to "bleep or delete," the exercise of that right can raise legal hurdles.  At least one court has concluded that the Family Movie Act is violated if a third party makes a copy of a movie for the purpose of allowing it to be "bleeped or deleted," or if a third party, as opposed to the consumer, alters the content of a movie. *See Clean Flicks, LLC v. Soderbergh*, 433 F. Supp. 2d 1236 (D. Colo. July 6, 2006)(also holding that the "first sale" doctrine does not to apply to third-party activities even if the third party's users are required to buy authorized copies of the DVDs and its activities have no effect on the copyright owners' sales).

In our view, Clean Flicks erred in failing to take into account that copyright law encompasses a bundle of rights, including reproduction, transmission, distribution, and public performance.  As explained below, the VidAngel technology does not implicate the reproduction, distribution, or public performance rights and thus limits the copyright infringement theories that could be asserted against it to just the transmission right.  As to its use of that right, VidAngel has a strong argument that it is making either (i) a use authorized by statute or (ii) a fair use in that transmission is a practical necessity to allow consumers to enjoy the benefits and protections that Congress intended them to have in enacting the Family Movie Act and in that such transmission will not hurt the economic interests of the copyright owners. Importantly, because VidAngel's technology is used while movies are being streamed to its customers, it never alters the content of any fixed copy of those movies.

## B.    VidAngel's Services Are Intended to Enable Substantial, Non-Infringing Uses of Copyrighted Content

VidAngel's proposed services find legal grounding in the Supreme Court's decision in *Sony Corp. of America v Universal City Studios, Inc.*, 464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984), which

---

[3] A reformatted copy of a DVD is obtained by extracting the contents of the DVD onto a different storage medium, often a hard drive, in a different format than that of the DVD. That process is sometimes referred to as "ripping."

PRIVILEGED AND CONFIDENTIAL

concerned the Betamax video recorder that Sony manufactured and sold to allow consumers to record television programs for later viewing.   Because the Betamax had substantial non-infringing uses, the Supreme Court upheld Sony's right to sell it.  The result in *Sony* will allow VidAngel to make an *a fortiori* argument that its technology is lawful because, unlike the Betamax, which was likely to be used for infringing as well as non-infringing purposes, VidAngel's technology incorporates features, extrinsic to its core functionality, intended to prevent copyright infringement. *See id.* at 422-24.

VidAngel's proposed services find additional support, at least to the extent they involve providing services to subscribers who own DVDs of the works involved, in the Supreme Court's recent decision in *American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. ____, 34 S. Ct. 2498, 139 L. Ed. 2d 476 (2014), which held that "an entity that transmits a performance to individuals in their capacities as owners or possessors does not perform to 'the public.'"  This is significant in that it seemingly removes the Transmit Clause of the Copyright Act as a concern to the extent that content is transmitted to the owners of DVDs, either as re-formatted copies or streamed, as when a VidAngel subscriber wishes to enjoy a movie without being exposed to content the viewer finds objectionable.

## C.   The Digital Millennium Copyright Act Preserves a DVD Owner's Right to Make and Use a Re-formatted Copy of that DVD.

The legal right of DVD owners to engage in the real-time filtering of the content recorded on those DVDs, and to use reformatted copies of their DVDs for non-commercial purposes that do not hurt the market for the movie on the DVD, finds support under existing law. *See* 17 U.S.C. § 110 (11) (real-time filtering); 17 U.S.C. § 107 (fair use is exception to infringement); *Harper & Row Publishers., Inc. v. Nation Enters.*, 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) (citation omitted) (explaining that market effect is "undoubtedly the single most important element of fair use").   The Digital Millennium Copyright Act ("DMCA'), which generally prohibits efforts to circumvent technological measures such as DVD scrambling, preserves a DVD owner's right to make a reformatted copy of his DVD for fair use purposes. *See RealNetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 942 (N.D. Cal. 2009) (explicating the textual distinctions between 17 U.S.C. § 1201(a) and (b) that protect a DVD owner's right to generate fair-use reformatted copies).

The portion of the *RealNetworks* opinion addressing the right to generate re-formatted content turned on the textual distinction between the access control provision in subsection (a) of 17 U.S.C. § 1201 (of the DMCA) and the provision for protection of rights of a copyright owner in subsection (b). *See RealNetworks* at 942-43.  Subsection (a), the access control provision, explicitly prohibits (1) all acts of circumvention, and (2) the development and distribution of products for circumvention. Subsection (b), the provision for protecting the rights of copyright owners, conspicuously omits both an access control provision and any prohibition on acts of circumvention. Like subsection (a), though, it includes a prohibition on developing and distributing products for circumvention. Based on these textual features, as well as a summary of the DMCA published by the Copyright Office two months after the DMCA was enacted, the court concluded that fair use applies to *acts* to circumvent technological measures for protecting copyright rights, but *not to the development or sale* of products for circumventing such measures. *See id.* (citing *United States Copyright Office Summary (Dec. 1998)* at 4 (explaining that the distinction between section 1201(a) and (b) as to the act of circumvention in itself was "to assure that the

PRIVILEGED AND CONFIDENTIAL

public will have the continued ability to make fair use of copyrighted works. Since copying may be a fair use under appropriate circumstances, section 1201 does not prohibit the act of circumventing a technological measure that prevents copying.")). This distinction between subsections (a) and (b) evidences that the DMCA recognizes and preserves a DVD's owner's right to generate a reformatted copy for fair uses.

The text of the DMCA supports the preservation of fair use: "Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c)(1). Thus, Congress (in the DMCA), the courts (in *RealNetworks*), and the Copyright Office (in the *United States Copyright Office Summary* relied on by the *RealNetworks* court) have all recognized a DVD owner's right to make and use re-formatted copies of personal DVDs.

VidAngel will avoid those prohibited activities by limiting itself to making re-formatted copies of DVDs it has purchased lawfully and then streaming the content, and by refusing to share its technology with its subscribers. That model contrasts sharply with RealNetworks' practice found to violate the DMCA—designing, manufacturing, and marketing a hardware product with integrated software to circumvent the Content Scrambling Systems ("CSS") protections built into the disks, albeit for the purpose of generating re-formatted copies of DVDs. *See RealNetworks*, 641 F. Supp. 2d at 927, 933.

VidAngel will additionally benefit from the fact that the purpose of its technology is to allow consumers to eliminate many types of potentially objectionable content when viewing copyrighted works. Accordingly, the works will be transformed ephemerally as they are streamed to viewers, but VidAngel will not retain any fixed copies. As explained below, transformative uses are typically accorded fair-use protection under the copyright laws.

## D.     Filtering Is Non-Infringing and Is Protected Under the Family Movie Act.

The Family Movie Act explicitly exempts filtering from copyright infringement:

> Notwithstanding the provisions of section 106, the following are not infringements of copyright:
>
> . . .
>
> (11) the making imperceptible, by or at the direction of a member of a private household, of limited portions of audio or video content of a motion picture, during a performance in or transmitted to that household for private home viewing, from an authorized copy of the motion picture, or the creation or provision of a computer program or other technology that enables such making imperceptible and that is designed and marketed to be used, at the direction of a member of a private household, for such making imperceptible, if no fixed copy of the altered version of the motion picture is created by such computer program or other technology.

17 U.S.C. § 110(11).

PRIVILEGED AND CONFIDENTIAL

VidAngel's filtering feature works by applying a customized stream to skip or mute segments of a movie by simply omitting them during streaming. That approach satisfies section 110(11) because it merely "makes imperceptible . . . limited portions . . . for private home viewing . . . from an authorized copy."

E.   **VidAngel's Plan to Stream Copyrighted Works Should Qualify for Fair-Use Protection.**

The Copyright Act identifies four non-exclusive factors a court should examine to determine whether a use is an infringement or a non-infringing fair use:

> The fair use of a copyrighted work . . . is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. *See, also, Harper & Row Publishers,* 471 U.S. at 549, 560 (factors are nonexclusive); *Sony,* 464 U.S. at 448 (fair use is an "equitable rule of reason") (citation omitted).

A defendant need not prevail with respect to each of the four enumerated fair-use factors to succeed on a fair-use defense. *See NXIVM Corp. v. Ross Inst.,* 364 F.3d 471, 477 (2d Cir. 2004). Rather, the factors are "explored and weighed together, in light of copyright's purpose." *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 569, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994). "The ultimate focus is the goal of copyright itself, whether 'promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it.'" *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.,* 861 F. Supp. 2d 336 (S.D.N.Y. May 17, 2012) (*citing Bill Graham Archives v. Dorling Kindersley, Ltd.,* 448 F.3d 605, 608 (2d Cir. 2006)( *quoting Castle Rock Entm't, Inc. v. Carol Publ'g Grp.,* 150 F.3d 132, 141 (2d Cir. 1998))), *aff'd,* 742 F.3d. 17 (2d Cir. Jan. 27, 2014).

The first enumerated fair use factor favors VidAngel. The "purpose and character" inquiry focuses on whether a use is transformative and on whether the use is for profit. *See Acuff Rose,* 510 U.S. at 579. That a work is transformative increases the likelihood that fair use will be found. *See Northland Fam Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform,* 868 F. Supp. 2d 962 (C.D. Cal. 2012) (quoting *Acuff Rose,* 510 U.S. at 579). VidAngel's "bleep or delete" service is by nature

PRIVILEGED AND CONFIDENTIAL

transformative in that it both alters the content of works as viewed by different users in different ways and it that from the perspective of the viewers, those works are transformed from objectionable to unobjectionable.

The second, and most important, enumerated fair use factor also favors VidAngel. The "market effect" analysis also favors VidAngel in that the demand for DVDs purchased lawfully will probably increase. VidAngel's technology will make it more likely that movies with content that some persons find objectionable will now be watched by those persons, thus increasing the demand for lawful DVDs. Indeed, VidAngel has advised that an after-movie survey it conducted showed that 93 percent of its customers would not have watched the movies they viewed on VidAngel.com if content they found offensive had not been removed. The finding that 93 percent of the movies purchased on VidAngel.com would not have been purchased had family filtering not been available thus support the inference that the availability of VidAngel's technology increased the demand for legal DVDs of those movies.

Market effect is "undoubtedly the single most important element of fair use." *Harper & Row, Publishers,* 471 U.S. 539 (1985) (citation omitted). This factor "requires the Court to strike a balance 'between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied.'" *Columbia Pictures Indus., Inc. v. Miramax Films Corp.,* 11 F. Supp. 2d 1179, 1189 (C.D. Cal. 1998) (quoting *MCA, Inc. v. Wilson,* 677 F.2d 180, 183 (2d Cir. 1981)); *Seltzer v. Green Day, Inc.,* 725 F.3d 1170, 1178 (9th Cir. 2013) (quoting *Acuff Rose,* 510 U.S. at 590 (explaining that the market effect factor "considers 'the extent of market harm caused by the particular actions of the alleged infringer and also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original'").

The only extent to which copyright owners might suffer an economic loss lies in the fact that VidAngel will create an efficient market for re-purchasing and re-selling DVDs. Notwithstanding that VidAngel's technology will likely increase the demand for recorded programming containing any of the many types of potentially objectionable content that its technology will render silent or absent, copyright owners might attempt to focus on the rapid re-sale and re-purchase of DVDs that VidAngel's technology will likely foster, arguing that such rapid changes of ownership could possibly reduce the market for new DVDs. In our opinion, a court will likely conclude that such argument is make weight in that DVDs are rented lawfully in large numbers, existing services lawfully stream content found on DVDs, and used DVDs are already bought and sold lawfully as allowed under the "first sale" doctrine. VidAngel's proposed technology will not change the nature of the last activity; it will merely make it more efficient in a manner that likewise is protected by the "first sale" doctrine. *See Kirtsaeng v. John Wiley & Sons, Inc.,* 568 U.S.____, 133 S. Ct. 1351, 185 L. Ed. 2d 392 (2013).

Nor will streaming a re-formatted copy of a DVD alter the ways and circumstances under which a DVD owner may lawfully view a DVD, thus potentially taking a market opportunity away from copyright owners. Instead, it will merely enable consumers to view DVDs without being required to use a DVD player. The VidAngel service will thus not enable any new uses of copyrighted material or result in the distribution of copyrighted material to the public. As the Ninth Circuit has observed, a use is far more likely to be fair when it does "not also simultaneously involve distribution of the copyrighted material to the general public." *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1019 (9th Cir. 2001).

PRIVILEGED AND CONFIDENTIAL

The third enumerated fair use factor is neutral. A court will likely conclude that the "amount and substantiality" factor is neutral. As in *Sony*, where copying whole works was necessary to enjoy the full benefit of the technology, "the fact that the entire work is reproduced . . . does not . . . militate against a finding of fair use." *Sony*, 464 U.S. at 449-50.

The fourth enumerated fair use factor favors VidAngel. The profit inquiry favors a finding of fair use notwithstanding that VidAngel is a commercial enterprise hoping to earn profits. VidAngel's business model favors that conclusion because the "crux of the profit-nonprofit distinction is whether the user stands to profit from exploitation of the copyrighted material," 'without paying the customary price.'" *Northland Fam. Planning Clinic*, 868 F. Supp. 2d at 978 (quoting *Acuff Rose.*, 510 U.S. at 562).

An additional factor also favors a finding of fair use. Because the four enumerated fair use factors are non-exclusive, VidAngel will additionally argue that obtaining and using a re-formatted copy merely reflects the evolution of viewing technology, which is already diminishing the demand for DVDs. Ten years ago, the only way consumers commonly viewed DVDs was on a DVD player connected to a television or installed in a computer. At that time, a DVD was the state-of-the-art technology for high-density media storage and playback. Advances in technology are now marginalizing the utility of DVD technology. A 32GB flash drive—with enough storage for at least six full-length DVD movies—currently costs about $13,[4] and additionally is much smaller than a DVD and can be re-written thousands of times. Many laptop computers do not even come with DVD drives anymore. In the last ten years network speeds—wired and wireless—have improved from choppy low-resolution video to real-time DVD-quality streaming. With the improvement in network speeds, movies can now be watched on mobile devices. Tablets have enough disk space to store several movies. Given today's technology, a DVD owner's access to his own DVD is actually marginalized if he or she is not able to obtain a reformatted copy.

A case in apparent conflict with the above analysis is *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000). In ruling in the plaintiff's favor, Judge Rakoff found that *MP3.com* profited by purchasing CDs, making unauthorized copies of them, and then streaming the contents of the CDs to subscribers. On those facts, MP3.com was found liable for copyright infringement notwithstanding the court's acknowledgement that the viewers, themselves, could lawfully have purchased the CDs and streamed copies of the CDs' contents to themselves.

Although there are obvious similarities between MP3.com's and VidAngel's business models, we believe that *MP3.com's* rigid view that an act that is non-infringing when performed *by the owner* of a copy of a work is infringing when performed *for the owner* by a third party will not guide a court assessing the lawfulness of VidAngel's technology for three reasons. First, section 110(11) of the Copyright Act expressly authorizes third parties acting "at the direction of a member of a private household" to do just that. Second, unlike MP3.com's technology, VidAngel's technology is intended to enable its users to benefit from a law enacted by Congress for the protection of the public: the Family

---

[4] http://www.amazon.com/s/ref=nb_sb_ss_c_0_11?url=search-alias%3Delectronics&field-keywords=flash%20drive&sprefix=flash+drive%2Caps%2C230

PRIVILEGED AND CONFIDENTIAL

Movie Act. Third, Judge Rakoff's strict application of the literal requirements of the Copyright Act contrasts with the softer approach to infringement taken by the Supreme Court majority in the recent *Aereo* decision. In *Aereo*, the majority suggested in dictum that a technical violation of the Copyright Act should not always be actionable, stating that a copyright owner's transmission right is not actionable when it does not result in the transmission of a performance "to the public."

Accordingly, we believe that it is probable that a court examining the legality of VidAngel's proposed business model today will conclude that it sets forth a permissible "fair use" of content owned by others.

F.     **VidAngel will not be liable for secondary infringement because there is no direct copyright infringement.**

Although a developer of software or equipment might not directly infringe copyrights, it can sometimes be liable as a contributory infringer or a vicarious infringer. "One infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *MGM, Inc. v. Grokster, Inc.*, 545 U.S. 913 (2005) (citations omitted); *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019-21 (9th Cir. 2001) (citations omitted).

VidAngel is not liable for contributory infringement for at least two reasons. First, as established above, there is no direct infringement. Second, VidAngel has not *intentionally* induced or encouraged direct infringement. On the contrary, and unlike Grokster's proven intent to induce infringement using a product that had substantial non-infringing uses, VidAngel includes multiple features designed to prevent copyright infringement. *See Grokster*, 545 U.S. 913 at 934-41 (holding that developer of a product could be liable for secondary infringement, where the product had substantial non-infringing uses, if there was evidence that the developer intended to induce infringing use of the product).

VidAngel is also not liable for vicarious infringement, by profiting from direct infringement while declining to exercise a right to stop or limit it," for at least two reasons. First, as established above, there is no direct infringement. Further, even if there were direct infringement, VidAngel does not have the ability to stop or limit it, but instead merely provides software designed for non-infringing uses. Unlike Napster, which had the ability to "locate infringing material listed on its search indices," but "turned a blind eye to detectable acts of infringement for the sake of profit," Napster, 239 F.3d at 1023-24 (citation omitted), VidAngel's technology is designed to deter infringement.

## III.     CONCLUSION

Many consumers would like to use legal means to benefit from the Family Movie Act in viewing motion pictures and television shows, but lack the technical sophistication to do so. VidAngel provides a means for such consumers to enjoy the protections afforded by the Family Movie Act while respecting the rights and economic interests of copyright holders. In the tradition of *Sony*, VidAngel provides a technology to enable legal uses that were previously technologically inaccessible. In addition to paralleling

**PRIVILEGED AND CONFIDENTIAL**

*Sony* in an enabling sense, VidAngel surpasses Sony in a copyright protection sense, by including multiple features to prevent copyright theft.

We therefore conclude, having analyzed VidAngel's technology in light of the current copyright regime and legal landscape, that VidAngel can make a strong argument that its technology does not infringe the rights of copyright holders and is legal if it is implemented as described herein.

*Exhibit "C"*

KUPFERSTEIN MANUEL & QUINTO LLP

11845 W. OLYMPIC BOULEVARD
SUITE 1000
LOS ANGELES, CA 90064

PHONE: (424) 248-6650
FAX: (424) 248-6652

July 23, 2015

Alan Braverman, Esq.
General Counsel
The Walt Disney Company
500 S. Buena Vista Street
Burbank, CA

Re: Proposed VidAngel Movie Streaming Service

Dear Mr. Braverman:

We are counsel to VidAngel, Inc. We are writing to request The Walt Disney Company's input concerning VidAngel's proposed streaming service for motion pictures and television programs, specifically to inquire about buying DVD and Blu-ray discs directly from The Walt Disney Company.

At the outset, we want to be clear concerning two things. First, the service VidAngel proposes to provide is not intended to compete with existing services that stream content "as-is." Rather, it is designed to allow consumers who might not otherwise purchase a particular DVD or Blu-ray movie or television show, due to personal preferences, to choose what they wish to have "muted or skipped" while the disc is played and streamed to them. These consumers generally want customized ("muted or skipped") playback out of a concern that the DVD or Blu-ray might contain material they they feel is inappropriate for their children or that they wish not to view or hear. Second, VidAngel wants to work with content-providers, and eventually purchase its Blu-ray and DVD discs directly from The Walt Disney Company, rather than from distributors. VidAngel believes that it can, in essence, partner with content-providers to allow consumers to benefit from the Family Home Movie Act, 17 U.S.C. 110 § (12), while enabling a bigger market reach.

This is how VidAngel's business works:

1. VidAngel lawfully purchases DVD or Blu-ray movies and television shows that it plans to stream.

2. VidAngel's community users review and tag the content to identify over 20 categories of content that a customer might wish to have excluded when

Alan Braverman, Esq.
General Counsel
July 23, 2015
Page 2

streamed to his or her family, such as profanity, vulgarity, blasphemy, nudity, sex acts, etc.

3. Customers select movies/shows they wish to see, purchase them, and choose which of the 20+ categories they want "muted or skipped" during the streaming. Note that the original content is unchanged; however, the playback experience is customized. Customers can adjust individual tags within the categories. For example, a customer can choose to mute the "F" word or skip a rape scene in a movie while keeping any or all of the other tagged content, thus allowing a customer to feel comfortable permitting younger audiences to watch the movie. Significantly, VidAngel does not make a copy of the altered version of the movie; it customizes the playback to skip or mute particular words or scenes based on each customer's preferences.

4. VidAngel purchases the DVD or Blu-ray disc for the customer and stores it in a physical vault. The purchase of the disc is on a one-to-one disc-to-customer basis prior to streaming its content to any customer. That is to say, there is a physical copy owned by every customer prior to streaming any content to any customer.

5. VidAngel's customers are allowed to have the contents of the discs they own streamed to them as many times as they want, with the types of content they identified muted or skipped. VidAngel does not, however, allow any one customer to have a work streamed to two devices simultaneously, nor does it allow any work to be streamed to any device that the customer has not previously logged into using his or her personal VidAngel account.

6. At a customer's request, VidAngel will ship any physical DVD or Blu-ray the customer owns to him or her or will re-purchase the disc at a discount from the sale price. The amount of the discount is based on the length of time the customer has owned that disc.

VidAngel began a limited beta test of its technology in January 2015 starting with 43 users and has grown the number of beta users to 4,848 users in June. To date, the service has proved very popular among beta users. VidAngel has already legally purchased many thousand Blu-ray and DVD discs to support these customers. Having tested demand for the service, VidAngel now needs to discuss direct purchasing of DVD and Blu-ray content in order to scale its business.

To gauge the interest its service will generate among all parents, as opposed to just the Beta test participants, VidAngel commissioned a consumer survey of randomly

Alan Braverman, Esq.
General Counsel
July 23, 2015
Page 3

selected parents nationwide which asked whether they would use parental control software that filters swearing and other content they view as inappropriate from movies streamed to their homes. Forty-seven percent of the survey respondents said that they would a) likely or b) very likely use it.

Significantly, VidAngel appears to be largely attracting consumers who would not otherwise watch certain DVD or Blu-ray content, as opposed to taking business away from other companies that purchase Blu-ray and DVD copies of content. Since launching the beta test in January, VidAngel has continuously surveyed its customers to ask whether they would have watched the content they selected had VidAngel not provided for their ability to mute or skip material they found offensive or did not wish to see or hear. The survey found that 77 percent of viewers would not have purchased that content had the ability to skip or mute certain language or content not been offered. If its business is successful, VidAngel's service will help grow the industry and will likely result in a substantial net increase in the total sales of DVD and Blu-ray discs.

You may access VidAngel's services at www.VidAngel.com. If you have any questions concerning VidAngel's technology or business model, please feel free to ask. If you disagree with VidAngel's belief that its technology fully complies with the Copyright Act or otherwise does not adequately protect the rights of copyright owners, please let us know. VidAngel wants to take the concerns of content owners into consideration and address them to the extent it can. VidAngel hopes that it will be viewed as a partner to content providers, substantially increasing legal sales of DVDs and Blu-ray copies of content. Finally, VidAngel would appreciate knowing the volumes required to buy DVD and Blu-Ray discs directly from The Walt Disney Company.

Please do not hesitate to contact with us any questions or concerns you might have.

Very truly yours,

David W. Quinto

cc:    Neal Harmon

*Exhibit "D"*



July 21, 2016

David Quinto
3007 Franklin Canyon Drive
Beverly Hills, CA 90210-1633

Re:  Offer of Employment

Dear David,

We are pleased to offer you employment with VidAngel, Inc. (the "**Company**"), at its Provo, UT location, beginning August 1, 2016 (the "**Start Date**").  We understand that you will likely need to spend a substantial amount of time working with and overseeing the Company's outside trial counsel in the Central District of California.  Your position will be General Counsel, performing such duties as are normally associated with this position and such other duties as are assigned to you from time to time consistent with your position and with the fact that you are admitted to practice law in California but not Utah. This is a full time position. Your initial salary will be at the rate of $14,583.34 semi-monthly, which equates to $350,000 on an annualized basis (the "**Base Salary**"), payable in accordance with the Company's standard payroll practices, which are subject to change from time to time. You will also be reimbursed for ordinary and reasonable business expenses incurred in connection with your job duties as allowed by Company policy or as agreed by the Company.  For purposes of this letter agreement (this "**Agreement**"), "**Board**" shall mean the Board of Directors of the Company, and "**Plan**" shall mean the 2014 Stock Incentive Plan of the Company as amended and/or restated from time to time.

You will also be eligible to participate in all Company fringe benefit plans, including, for example, group health insurance in accordance with the Company's benefit plan requirements.  All matters of eligibility for coverage or benefits under any benefit plan shall be determined in accordance with the provisions of such plan.  The Company reserves the right to change, alter, or terminate any benefit plan in its sole discretion.

The April 15, 2015 grant to you and Scott Commerson of an option to purchase 225,000 share of the Company's Common Stock (the "Shares") at an exercise price of $0.50 per share, equal to the fair market value of one share of the Company's Common Stock as of that date as was determined by the Board (the "Option"), will be modified per the Acknowledgement and Consent Agreement among the Company, David Quinto and Scott Commerson, to provide that you may purchase 219,792 shares of the Company's Common Stock (the "Shares") as set forth below, and Scott Commerson may exercise his option to purchase 5,208 shares provided that he does so within 30 days following the execution of the Acknowledgement and Consent Agreement by the parties, after which date Scott Commerson's options will expire. The Vesting Reference Date will be amended to the Start Date, and The Time of the Exercise of Option paragraph of Exhibit A to the Stock Option Agreement will be amended to change the vesting requirements of the remaining 219,792 options as follows: (i) one-fourth (1/4th) of the options shall vest twelve (12) months after the Start Date, and one thirty sixth (1/36th) of the remaining options shall vest on

each monthly anniversary of the Start Date over the three-year period thereafter, subject to your continuing eligibility and employment with the Company.  The Option will be subject to the terms and conditions applicable to options granted under the Plan, as described in that Plan and the applicable option agreement.

In the event you are terminated without Cause within twelve months following a Change in Control or you resign for Good Reason within twelve months following a Change in Control, provided that you execute a general release of claims in a form acceptable to the Company (the "*Release*") within forty-five days of your termination, and further provided that you do not revoke such release, you shall be entitled to accelerated vesting of 100% of your Option immediately following the effective date of such termination. The Option shall also be subject to, and you do hereby agree to, the 280G Limitations, and each of "280G Limitations", "Cause", and "Good Reason" shall have the meanings set forth on **EXHIBIT B** hereto. "*Change in Control*" shall have the meaning of "Transaction" as set forth in the Plan.

Your employment is subject to the Company's personnel policies and procedures as they may be interpreted, adopted, revised or deleted from time to time in the Company's sole discretion.   Your employment with the Company may be suspended (or terminated) without cause subject to the Obligations below.  In addition, the Company reserves the right to modify your position, duties or reporting relationship to meet business needs and, in its sole discretion, to increase your compensation or incentives commensurate with market conditions and the Company's financial condition. Notwithstanding the foregoing, if your employment with the Company is terminated without Cause before July 31, 2021 (the "Severance Coverage Period") or you resign for Good Reason within the Severance Coverage Period and the Company is conducting business in the United States substantially unimpaired by any form of injunction, you shall be entitled to receive your Base Salary through July 31, 2021, but if the Company's business operations in the United States are substantially impaired such that the Company cannot operate profitably, the Company will be permitted to draw down on the Collateral without regard to the balance in the Collateral account for so long as such impairment continues. If the Collateral account is exhausted during the period of substantial impairment, the Company shall have no further obligation to make, and shall not be indebted to you for, any additional Base Salary payments. Each of the preceding Base Salary payment obligations is contingent upon your execution of a Release. All Base Salary payments shall be made according to the Company's normal payroll practices and subject to applicable withholding requirements.

The Company shall open a new bank account into which it will deposit funds for the purpose of collateralizing the Obligations (and no other assets or property of the Company shall be included in the definition of Collateral) (such account, the "*Account*"). The amount of funds that shall initially be deposited into the Account shall be $350,000 ("*Initial Collateral Amount*").   The funds maintained in the Account shall not be permitted to fall below the Initial Collateral Amount during the first four years of this Agreement.  Your initial salary payments shall be paid by the Company without resort to the use of the funds in the Account.  Following the Company's next equity financing in which at least $2 million of new cash equity capital is raised by the Company (the "*Financing*"), the Company shall deposit an additional $700,000 into the Account. Following the Financing, the Company may withdraw funds from the Account in amounts less than or equal to the satisfaction of its Salary Obligations until only the Initial Collateral Amount remains.   The Company represents and warrants that the funds deposited into the Account will not be used as collateral or encumbered for any other purpose.  The Company will assist you in filing  UCC-1 statements.  The Company's grant to you of a security interest does not include, any license or contract rights to the extent: (i) the granting of a security interest therein would be contrary to applicable law; or (ii) that such rights are nonassignable by their terms (but only to the extent the prohibition is enforceable under applicable law).  Company hereby authorizes you at any time and from

time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto concerning the Collateral.

This offer is contingent on: (a) your executing a proprietary information and inventions agreement in substantially the form of **EXHIBIT A** attached hereto (the "***Inventions Agreement***"), and (b) your satisfying the eligibility requirements for employment in the United States.

This Agreement is intended to comply with the requirements of Internal Revenue Code Section 409A, or any applicable exemptions from Code Section 409A, as the case may be. Any payments that qualify for the "short-term deferral" exception or another exception under Code Section 409A will be paid under such exception. Despite any contrary provision of this Agreement (i)(a) all payments to be made upon a termination of employment under this Agreement may only be made upon a "separation from service" under Section 409A of the Code; (b) in no event may you, directly or indirectly, designate the calendar year of any payment under this Agreement; and (c) any reference to termination of employment or your date of termination shall mean and refer to the date of your "separation from service," as that term is defined in Treas. Reg. Section 1.409A-1(h), and (ii) all reimbursements and in-kind benefits provided under this Agreement will be made or provided in accordance with the requirements of Code Section 409A, including, where applicable, the requirement that (w) any reimbursement is for expenses incurred during your lifetime (or during a shorter period of time specified in this Agreement); (x) the amount of expenses eligible for reimbursement, or in kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in kind benefits to be provided, in any other calendar year; (y) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred; and (z) the right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit.

By signing this letter, you are representing that you have full authority to accept this position and perform the duties of the position without conflict with any other obligations and that you are not involved in any situation that might create, or appear to create, a conflict of interest with respect to your loyalty to or duties for the Company. You specifically warrant that you are not subject to an employment agreement or restrictive covenant preventing full performance of your duties to the Company. You agree not to bring to the Company or use in the performance of your responsibilities at the Company any materials or documents of a former employer that are not generally available to the public, unless you have obtained express written authorization from the former employer for their possession and use. You also agree to honor all obligations to former employers during your employment with the Company.

By signing this letter, you acknowledge that the terms described in this letter, together with the Inventions Agreement attached hereto, set forth the entire understanding between us and supersedes any prior representations or agreements, whether written or oral; there are no terms, conditions, representations, warranties or covenants other than those contained herein. No term or provision of this letter may be amended waived, released, discharged or modified except in writing, signed by you and an authorized officer of the Company, except that the Company may, in its sole discretion, adjust salaries, incentive compensation, stock plans, benefits, job titles, locations, duties, responsibilities, and reporting relationships.

*[Remainder of Page Intentionally Left Blank]*

       This is an exciting time for our business and for our industry.  We look forward to your joining our team and becoming a part of this excitement.  Please indicate your acceptance of this offer by signing below and returning to me along with the executed Inventions Agreement.

Sincerely,

DocuSigned by:

_A167C182CC024E6..._

Neal Harmon
Chief Executive Officer
VidAngel, Inc.

ACCEPTED AND AGREED TO:

DocuSigned by:

David Quinto

_7865130F705645D..._

(Signature)

Printed Name:   David Quinto
Date: 7/21/2016

**EXHIBIT A**

**INVENTIONS AGREEMENT**

DocuSign Envelope ID: 8C96BD62-9A6E-43B2-98E8-4896F98DF0C1

### EXHIBIT B – DEFINITIONS

"***Cause***" for termination shall be limited to the occurrence of any of the following events: (a) your commission of any felony or any crime involving fraud, dishonesty or moral turpitude under the laws of the United States or any state thereof; (b) your material violation of any contract or agreement between you and the Company which remains uncured after thirty (30) days written notice thereof; (c) your willful failure to satisfactorily perform your job duties which remains uncured after thirty (30) days written notice of such deficiency; (d) your engaging or participating in any activity which violates any material provisions of your Proprietary Information and Inventions Agreement with the Company; (e) your gross misconduct including, without limitation, any willful misconduct independent of the Company that has a significant adverse impact upon the operations, business, reputation or valuation of the Company, or (f) your becoming disbarred, suspended, reprimanded, conflicted or in any manner becoming ineligible or unable to represent the Company as legal counsel in a material litigation matter.

"***Good Reason***" for you to terminate your employment hereunder shall mean the occurrence of any of the following events without your consent; provided however, that any resignation by you due to any of the following conditions shall only be deemed for Good Reason if: (i) you give the Company written notice of the intent to terminate for Good Reason within ninety (90) days following the first occurrence of the condition(s) that you believe constitutes Good Reason, which notice shall describe such condition(s); (ii) the Company fails to remedy, if remediable, such condition(s) within thirty (30) days following receipt of the written notice (the "***Cure Period***") of such condition(s) from you; and (iii) you actually resign your employment within the first fifteen (15) days after expiration of the Cure Period: (a) a material breach of this Agreement with you by the Company; (b) a material reduction by the Company of your Base Salary as initially set forth herein (other than as a result of your termination for Cause), or (c) a material reduction in your authority, duties or responsibilities.

"***280G Limitations***" shall mean the following obligations in the event of an acceleration of the vesting of the Option following a Change in Control: If, in such event, any portion of the payments, benefits and vesting to or for your benefit (including, but not limited to, payments, benefits and vesting under this Agreement but determined without regard to solely the vesting of the Option) (collectively "***Payment***") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended and the regulations and other guidance promulgated thereunder (the "***Code***"), and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "***Excise Tax***"), then such Payment shall be reduced to the Reduced Amount. The "***Reduced Amount***" shall be either (x) the largest portion of the Payment that would result in no portion of the Payment being subject to the Excise Tax or (y) the largest portion, up to and including the total, of the Payment, whichever amount, after taking into account all applicable federal, state and local employment taxes, income taxes, and the Excise Tax (all computed at the highest applicable marginal rate), results in your receipt, on an after-tax basis, of the greater amount of the Payment notwithstanding that all or some portion of the Payment may be subject to the Excise Tax. If a reduction in payments or benefits constituting "parachute payments" is necessary so that the Payment equals the Reduced Amount, reduction shall occur in the following order: reduction of cash payments; cancellation of accelerated vesting of stock awards; reduction of employee benefits. In the event that acceleration of vesting of stock award compensation is to be reduced, such acceleration of vesting shall be cancelled in the reverse order of the date of grant of your stock awards. The determination as to whether your payments, benefits and vesting are parachute payments and, if so, the Reduced Amount shall be calculated at the Company's expense by such certified public accounting firm as the Board may designate prior to a Change in Control (the "***Accounting Firm***"). Any good faith determinations of the Accounting Firm made hereunder shall be final, binding and conclusive upon you and the Company.

"*Collateral*" shall mean solely the Account (and no other assets or property of the Company shall be included in the definition of Collateral) as more fully set forth in the sixth full paragraph of the Agreement.

# VIDANGEL, INC.
## PROPRIETARY INFORMATION,
## INVENTION ASSIGNMENT, NONCOMPETITION AND ARBITRATION AGREEMENT
### July 21, 2016

As a condition of my employment with VidAngel, Inc., a Delaware corporation with its headquarters in the state of Utah, its subsidiaries, affiliates, predecessors, successors or assigns (together the "*Company*"), and in consideration of my further employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, and for other consideration, the receipt and sufficiency of which are hereby acknowledged, I agree to the following:

1.     **Confidential Information**.

a.     <u>Company Information</u>.  I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the exclusive benefit of the Company, or to disclose to any person, firm or entity without written authorization of an authorized officer (other than myself), any Confidential Information of the Company.  I understand that "*Confidential Information*" means any non-public information *that relates to the actual or anticipated business or research and development of the Company*, proprietary information, technical data, formulae, trade secrets or know-how, including, but not limited to, research, business plans, marketing plans, product plans, products, services, suppliers, customer lists and customers (including, but not limited to, customers of the Company on whom I call or with whom I become acquainted during the term of my employment), markets, software, source code, developments, development environment, specifications, flow charts, inventions, operations, procedures, methods, processes, compilations of data, technology, designs, drawings, engineering, devices, hardware configuration information, marketing, finances or other business information.     I further understand that Confidential Information does not include any of the foregoing items that has become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

b.     <u>Acknowledgments</u>.     I acknowledge that during my employment with the Company, I will have access to Confidential Information, all of which shall be made accessible to me only in strict confidence; that unauthorized disclosure of Confidential Information will damage the Company's business; that Confidential Information would be susceptible to immediate competitive application by a competitor of the Company's; that the Company's business is substantially dependent on access to and the continuing secrecy of Confidential Information; that Confidential Information is novel, unique to the Company and known only to me, the Company and certain key employees and contractors of the Company; that the Company shall at all times retain ownership and control of all Confidential Information; and that the restrictions contained in this agreement are reasonable and necessary for the protection of the Company's legitimate business interests. Pursuant to the Defend Trade Secrets Act of 2016, I acknowledge that I shall not have criminal or civil liability under any Federal or State trade secret law for the disclosure of a trade secret that  (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  In addition, if I file a lawsuit for retaliation by the Company for reporting a suspected violation of law, I may disclose the trade secret to my attorney and may use the trade secret information in the court proceeding, if I (X) file any document containing the trade secret under seal; and (Y) do not disclose the trade secret, except pursuant to court order.

c.     <u>Former Employer Information</u>.  I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.  I will use in the performance of my duties only information which is generally known and used by persons with training and experience comparable to my own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by the Company.

d.     <u>Third Party Information</u>.  I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

2.     **Inventions**.

a.     <u>Inventions Retained and Licensed</u>.  I have attached hereto, as **Exhibit A**, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment with the Company (collectively referred to as

"***Prior Inventions***"), which belong to me, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions. If, in the course of my employment with the Company, I incorporate into a Company product, process or service a Prior Invention owned by me or in which I have an interest, I hereby grant to the Company a nonexclusive, royalty-free, fully-paid up, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or service, and to practice any method related thereto. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Prior Inventions or inventions of third parties in any Inventions without the Company's prior written consent

b.        Assignment of Inventions. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I have solely or jointly conceived or developed or reduced to practice, or caused to be conceived or developed or reduced to practice and which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I have been and am in the employ of the Company (collectively referred to as "***Inventions***"), except as provided in Section 3(f) below. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Invention developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty will be due to me as a result of the Company's efforts to commercialize or market any such Invention.

c.        Inventions Assigned to the United States. I agree to assign to the United States government all my right, title, and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

d.        Maintenance of Records. I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

e.        Patent and Copyright Registrations. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

f.        Exception to Assignments. I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any invention that qualifies fully under the provisions of Utah Code Title 34, Chapter 39, Section 3 (attached hereto as **Exhibit B**). I will advise the Company promptly in writing of any inventions that I believe meet the criteria in Utah Code Title 34, Chapter 39, Section 3 and are not otherwise disclosed on **Exhibit A**.

g.        No Self-Help or Unauthorized Code. I represent and warrant to the Company, that I will not knowingly infect, incorporate into or combine with any computer system, computer program, software product, database or computer storage media of the company any Self-Help Code or Unauthorized Code (as defined below). "***Self-Help Code***" means any back door, time bomb, drop dead device, or other illegitimate or harmful routing, code, algorithm or hardware component designed or used: (i) to disable, erase, alter or harm any computer system, computer program, database, data hardware or communications system, automatically with the passage of time, or under the control of, or through some affirmative action by, any person, or (ii) to access any computer system, computer

program, database, data, hardware or communications system. "Self-Help Code" does not include any routine, code, algorithm or hardware component which is known to Company management and which is intended by Company management to be incorporated into or combined with any computer system, computer program, software product, database or computer storage media of the Company. For example, computer programs used for legitimate and authorized access to computer systems (e.g., remote assess via modem) are not Self-Help Code. "*Unauthorized Code*" means any virus, Trojan horse, worm, or other illegitimate or harmful routine, code, algorithm or hard component designed or used to disable, erase, alter, or otherwise harm any computer system, program, database, data, hardware or communications system, or to consume, use, allocate or disrupt any computer resources.

3.      **Conflicting Employment**.  I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities that conflict with my obligations to the Company.

4.      **Returning Company Documents**.  I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, formulae, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to paragraph 3(d).    I understand and agree that compliance with this paragraph may require that data be removed from my personal computer equipment.     Consequently, upon reasonable prior notice, I agree to permit the qualified personnel of the Company or its contractors access to such computer equipment for that purpose.

5.      **Notification of New Employer**.  In the event that I leave the employ of the Company, I agree to notify the Company of my new employer and hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

6.      **Solicitation of Employees**.  I agree that for a period of 12 months immediately following the termination of my relationship with the Company for any reason, whether with or without good cause or for any or no cause, at the option either of the Company or myself, with or without notice, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their

employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away such employees, either for myself or for any other person or entity.

7.      **Conflict of Interest Guidelines**.  I agree to diligently adhere to the Conflict of Interest Guidelines attached hereto as **Exhibit C**.

8.      **Covenant Not to Compete**.
        a.      Covenant.  I agree that during the course of my employment and for 12 months following the termination of my relationship with the Company (the "*Noncompetition Period*") for any reason, whether with or without good cause or for any or no cause, at the option either of the Company or myself, with or without notice, I will not, without the prior written consent of the Company, (i) serve as a partner, employee, consultant, officer, director, manager, agent, associate, investor, or (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate myself with any business, (a) in competition with or otherwise similar to the Company's business, (b) any other line of business in which the Company was engaged at any time during my employment with the Company; or (c) any other line of business into which the Company, during my employment with the Company, formed an intention to enter during the Noncompetition Period, and which an officer of the Company has disclosed to me in writing within ten (10) days following the termination of my employment with the Company.  This covenant shall not prohibit me from owning less than two percent of the securities of any competitor of the Company, if such securities are publicly traded on a nationally recognized stock exchange or over-the-counter market.  The foregoing covenant shall cover my activities in every part of the Territory in which I may conduct business during the term of such covenant as set forth above. "*Territory*" shall mean (i) all counties in the state of the Company's headquarters, (ii) all other states of the United States of America and (iii) all other countries of the world; *provided that*, with respect to clause (iii), the Company derives at least three percent (3%) of its gross revenues from any such geographic area prior to the date of the termination of my relationship with the Company.  Further, I agree that for a period of 12 months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, at the option either of the Company or myself, with or without notice, I will not, without the prior written consent of the Company, (x) solicit business or sales, for the same or similar products or services as provided by the Company, from any customer, client or account of the Company with which I have had any contact during the term of employment ("*Customers*") or (y) attempt to convert Customers to other sellers or providers for the

same or similar products or services as provided by the Company.

b. <u>Acknowledgement</u>. I acknowledge that my fulfillment of the obligations contained in this Agreement, including, but not limited to, my obligation neither to disclose nor to use the Company's Confidential Information other than for the Company's exclusive benefit and my obligation not to compete contained in subsection (a) above, is necessary to protect the Company's Confidential Information and, consequently, to preserve the, trade secrets, value and goodwill of the Company. I further acknowledge the time, geographic and scope limitations of my obligations under subsection (a) above are reasonable, especially in light of the Company's desire to protect its Confidential Information and trade secrets, and that I will not be precluded from gainful employment if I am obligated not to compete with the Company during the period and within the Territory as described above.

c. <u>Severability</u>. The covenants contained in subsection (a) above shall be construed as a series of separate covenants, one for each city, county and state of any geographic area in the Territory. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in subsection (a) above. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event the provisions of subsection (a) are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, then permitted by such law.

9. **Representations**. I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

10. **General Provisions**.

a. <u>Governing Law; Consent to Personal Jurisdiction</u>. This Agreement will be governed by the laws of the state of the Company's headquarters without regard for conflicts of laws principles. I hereby expressly consent to the exclusive personal jurisdiction of the state and federal courts located in the state of the Company's headquarters for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

b. <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

c. <u>Other Agreements</u>. In the event of any direct conflict between any term of this Agreement and any term of any other agreement executed by me, the terms of this Agreement shall control. If I signed or sign any other agreement(s) relating to or arising from my employment with the company, all provisions of such agreement(s) that do not directly conflict with a provision of this Agreement shall not be affected, modified or superseded by this Agreement, but rather shall remain fully enforceable according to their terms.

d. <u>Severability</u>. If one or more of the provisions in this Agreement are deemed void by law, including, but not limited to, the covenant not to compete in <u>Section 8</u>, then the remaining provisions will continue in full force and effect.

e. <u>Survival</u>. My obligations under this Agreement shall survive the termination of my employment with the Company and shall thereafter be enforceable whether or not such termination is claimed or found to be wrongful or to constitute or result in a breach of any contract or of any other duty owed or claimed to be owed to me by the Company or any Company employee, agent or contractor.

f. <u>Successors and Assigns</u>. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

g. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be enforceable, and all of which together shall constitute one agreement.

h. <u>Forum Selection</u>. Any claims arising out of or relating in any way to this Agreement must be resolved exclusively by a state or federal court located in the city of Salt Lake City, Utah, and employee agrees to submit to personal jurisdiction in any such court.

**I acknowledge and agree to each of the following**:

I am executing this Agreement voluntarily and without any duress or undue influence any other party;

I have carefully read this Agreement. I have asked any questions needed for me to understand the terms, consequences and binding effect of this Agreement and fully understand them; and

I sought the advice of an attorney of my choice if I elected to before signing this Agreement.

Executed on the date first set forth above.

**EMPLOYEE:**

Signature _David Quinto_

7865130F705645D...

Printed Name: ___David Quinto___

Address: 3007 Franklin Canyon Drive
Beverly Hills, CA 90210-1633

**ACKNOWLEDGED AND AGREED:**

**VIDANGEL, INC.**

Signature: _____

A167C182CC024E5

Name: ___Neal Harmon___

Title: ___CEO___

## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP

Title                    Date                    Identifying Number or Brief Description

None

none
____        No inventions or improvements

none
____        Additional Sheets Attached


Signature of Employee: David Quinto

Print Name of Employee: David Quinto

Date: 7/21/2016

## EXHIBIT B

### UTAH CODE TITLE 34, CHAPTER 39, SECTION 3

**Scope of act—When agreements between an employee and employer are enforceable or unenforceable with respect to employment inventions—Exceptions.**

(1)  An employment agreement between an employee and his employer is not enforceable against the employee to the extent that the agreement requires the employee to assign or license, or to offer to assign or license, to the employer any right or intellectual property in or to an invention that is:

(a)  created by the employee entirely on his own time; and

(b)  not an employment invention.

(2)  An agreement between an employee and his employer may require the employee to assign or license, or to offer to assign or license, to his employer any or all of his rights and intellectual property in or to an employment invention.

(3)  Subsection (1) does not apply to:

(a)     any right, intellectual property or invention that is required by law or by contract between the employer and the United States government or a state or local government to be assigned or licensed to the United States; or

(b)     an agreement between an employee and his employer which is not an employment agreement.

(4)  Notwithstanding Subsection (1), an agreement is enforceable under Subsection (1) if the employee's employment or continuation of employment is not conditioned on the employee's acceptance of such agreement and the employee receives a consideration under such agreement which is not compensation for employment.

(5)  Employment of the employee or the continuation of his employment is sufficient consideration to support the enforceability of an agreement under Subsection (2) whether or not the agreement recites such consideration.

(6)  An employer may require his employees to agree to an agreement within the scope of Subsection (2) as a condition of employment or the continuation of employment.

(7)  An employer may not require his employees to agree to anything unenforceable under Subsection (1) as a condition of employment or the continuation of employment.

(8)  Nothing in this chapter invalidates or renders unenforceable any employment agreement or provisions of an employment agreement unrelated to employment invention.

### UTAH CODE TITLE 34, CHAPTER 39, SECTION 2

**Definitions.**

As used in this chapter:

(2)  "Employment invention" means any invention or part thereof conceived, developed, reduced to practice, or created by an employee which is:

h.      conceived, developed, reduced to practice, or created by the employee:

(i)  within the scope of his employment;

(ii)  on his employer's time; or

(iii)  with the aid, assistance, or use of any of his employer's property, equipment, facilities, supplies, resources, or intellectual property;

(b)  the result of any work, services, or duties performed by an employee for his employer;

(c)  related to the industry or trade of the employer; or

(d)  related to the current or demonstrably anticipated business, research, or development of the employer.

(2)  "Intellectual property" means any and all patents, trade secrets, know-how, technology, confidential information, ideas, copyrights, trademarks, and service marks and any and all rights, applications, and registrations relating to them.

DocuSign Envelope ID: 8C96BD62-9A6E-43B2-98E8-4896F98DF0C1

# EXHIBIT C

## CONFLICT OF INTEREST GUIDELINES

It is the policy of the Company to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics.  Accordingly, all officers, employees and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company.  The following are potentially compromising situations that must be avoided.  Any exceptions must be reported to the President and written approval for continuation must be obtained.

Revealing confidential information to outsiders or misusing confidential information.  Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended or occurs.  (Proprietary Information, Invention Assignment, Noncompetition and Arbitration Agreement elaborates on this principle and is a binding agreement.)

1.      Accepting or offering substantial gifts, excessive entertainment, favors or payments which may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

2.      Participating in civic or professional organizations that might involve divulging confidential information of the Company.

3.      Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

4.      Initiating or approving any form of personal or social harassment of employees.

5.      Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

6.      Borrowing from or lending to employees, customers or suppliers.

7.      Acquiring real estate of interest to the Company.

8.      Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

9.      Unlawfully discussing prices, costs, customers, sales, strategies, or markets with competing companies or their employees.

10.     Making any unlawful agreement with distributors with respect to prices.

11.     Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

12.     Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review.  Violations of this conflict of interest policy may result in disciplinary action up to and including termination.